# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

ARTEMIS COFFIN, GEORGE BAKER,
DARRELL FLANDERS, JAMES MINGO,
TERRENCE LYON, HAROLD SMITH,
ROBERT DEWITT, DUANE L. HANSCOM,
JOSEPH GAGLIARDI JR., TRINA VAZNIS,
RAYMOND MACDONALD, ROBERT P.
HEALEY, BARRY BRYANT, LEE
WHEATON and GALEN M. LANDER,

Individually and as Representatives of a class
of all persons similarly situated,

        Plaintiffs

v.                                                                                  Civil No. 03-227-B-C

BOWATER INCORPORATED, GROUP
PROTECTION FOR EMPLOYEES OF
BOWATER INCORPORATED – GREAT
NORTHERN PAPER, INC. DIVISION,
BOWATER INCORPORATED POINT OF
SERVICE MEDICAL BENEFITS PLAN,
BOWATER INCORPORATED BENEFIT
PLAN and BOWATER LIFE INSURANCE
PLAN,

        Defendants

Gene Carter, Senior District Judge

### MEMORANDUM OF DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

        This action was commenced by fifteen retirees from Great Northern Paper, owned

at one time by Defendant Bowater, Inc., in which the retirees seek redress for their loss of

health and welfare benefits.  Plaintiffs' claims are brought on behalf of themselves, their

beneficiaries, and a class of persons similarly situated, under sections 502(a)(1)(B),

502(a)(2), and 502(a)(3) of the Employee Retirement Income and Security Act of 1974

("ERISA"), 29 U.S.C. § 1001, *et seq.* (Count I), and section 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 141, *et seq.* (Counts II and III).[1]

On June 21, 2005, the Court certified Counts I, II, and III for class action

treatment.  *See* Memorandum of Decision and Order Granting in Part Plaintiffs' Motion

for Class Certification (Docket Item No. 115).  The Court modified the class definition

language on July 15, 2005, to reflect a stipulation between the parties concerning

exhaustion of administrative remedies.  *See* Order Amending Class Definition (Docket

Item No. 135). The class is now defined as follows:

**General Class.**  All persons who:

> (1) were receiving company-paid health coverage from Great Northern
> Paper, Inc. ("GNP") prior to its 2003 bankruptcy, because (i) they had
> retired on pension when GNP was under the ownership of Bowater
> between January 1, 1992, and August 17, 1999, or in a short window
> period after the sale of GNP, extending to October 1, 1999; (ii) they
> were eligible spouses or dependents of such retirees; or (iii) their
> former spouse had died as an employee at GNP when it was under
> Bowater ownership -- and any individuals who became eligible
> spouses or dependents of such retirees after the bankruptcy, and

> (2) submitted a claim for benefits to Bowater on or before June 21, 2005,
> unless that person received at least one denial letter from Bowater
> prior to December 23, 2004, and did not file at least one appeal with
> Bowater within 180 days of receiving such a pre-December 23, 2004,
> denial letter.

> **Subclass A**: Those individuals who meet the criteria of paragraph (1) of
> the general class by reason of a retirement or a death of a union-
> represented employee that occurred before August 17, 1999.

---

[1] Count IV of Plaintiffs' Third Amended Complaint, alleging breach of fiduciary duty under
ERISA, was dismissed with prejudice (Docket Item No. 148) following Plaintiffs' unopposed Motion to
Dismiss (Docket Item No. 147).

**Subclass B**: Those individuals who meet the criteria of paragraph (1) of the general class by reason of a retirement or a death of a union-represented employee that occurred after August 17, 1999.

Now before the Court are Defendants' Motion for Summary Judgment (Docket Item No. 119) and Plaintiffs' Amended Motion for Partial Summary Judgment (Docket Item No. 129). Defendants move for summary judgment on all counts and Plaintiffs move for summary judgment on Count I only. For the reasons set forth below, the Court will grant in part and deny in part both Motions.

## I. Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). "A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *De-Jesus-Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841-42 (1st Cir. 1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995)).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has presented evidence of the absence of a genuine issue, the nonmoving party must respond by "placing at least one material fact into dispute." *FDIC v. Anchor Props.*, 13 F.3d 27, 30 (1st Cir. 1994).

When facing cross-motions for summary judgment under either Rule 56(c) or (d), "the district court must resolve all genuine factual disputes in favor of the party opposing each such motion and draw all reasonable inferences derived from the facts in that party's favor." *Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 223 (1st Cir. 2003). "The court must mull each motion separately, drawing inferences against each movant in turn." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003); *see also Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*. Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted). However, there is "no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood." *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Bearing in mind the governing authorities on cross motions for summary judgment, the Court now turns to the facts of this case.

## II.  Facts

### a.  Bowater's Ownership of Great Northern Paper

The original Great Northern Paper Company was incorporated in Maine in 1898 and in 1970 merged with Nekoosa Edwards Paper Company to form Great Northern Nekoosa Corporation (hereinafter "GNN").  Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (Docket Item No. 145) ¶ 5.  In 1990, Georgia-Pacific Corporation acquired all of the assets of GNN.  Defendants' Statement of Undisputed Material Facts (Docket Item No. 120) ¶ 6.  In the fall of 1991, GNN transferred all of its Maine assets -- including approximately 2,100,000 acres of timberlands, paper mills in Millinocket and East Millinocket, Maine, a hydroelectric facility, and a sawmill known as "Pinkham Lumber Co." -- to a newly formed entity also known as Great Northern Paper Company (hereinafter "GNP").  *Id.* ¶ 7.  At that time, GNP was incorporated in the state of Delaware and was wholly owned by GNN.  *Id.*

In late 1991, Bowater, Inc. purchased eighty percent of GNP's stock from Georgia-Pacific, *Id.* ¶ 10, and Bowater subsequently purchased the remaining twenty percent of GNP's stock.  *Id.*  Bowater owned GNP from the end of 1991 through August 1999.  During this period of ownership, Bowater maintained employee welfare benefit plans for its employees -- including those employees working for GNP.  The Court briefly describes the major plans at issue.[2]

### 1.  Bowater Incorporated Point of Service Medical Benefits Plan

The Bowater Incorporated Point of Service Medical Benefits Plan (hereinafter "Bowater POS-A Plan") (Attached as Exhibit 4 to Plaintiffs' Statement of Material Facts

---

[2] There is no occasion to describe the Bowater Life Insurance Plan, as the record indicates that no Plaintiff submitted a claim for benefits under this Plan during the time period in question.

(Docket Item No. 126) and Exhibit 103 to Defendants' Statement of Undisputed Material Facts) was a welfare benefit plan that provided health benefits to eligible participants. Plaintiffs' Statement of Material Facts ¶ 3. Effective January 1, 1996, the Bowater POS-A welfare benefit plan was described by a Summary Plan Description (hereinafter "SPD"). *Id.* ¶ 4. Participants in the Bowater POS-A Plan included certain GNP employees who retired between January 1, 1992, and October 1, 1999. *Id.* ¶ 5. Salaried employees who retired between January 1, 1992, and October 1, 1999, were also eligible to participate in the Bowater POS-A Plan. *Id.* ¶ 6. All hourly employees who retired between January 1, 1996, and October 1, 1999, were participants in the Bowater POS-A Plan, *Id.* ¶ 7, and all hourly employees who retired from GNP between January 1, 1992, and December 31, 1995, and who elected to switch from another health benefit plan, were also eligible to be participants in the Bowater POS-A Plan. *Id.* ¶ 8. The Bowater POS-A Plan Document identified Bowater, Inc. as the Sponsor of the POS-A Plan, the Plan Administrator of the POS-A Plan, and the source of benefits of the POS-A Plan. *Id.* ¶ 13.[3] The POS-A Plan Document[4] identified the Plan Sponsor as the entity with the power to "modify or amend the provisions, terms and conditions of the Plan" and the power to "terminate the Plan." *Id.* ¶ 14.

With respect to amendments and/or termination of the POS-A Plan, the following language was contained in the text of the Plan:

> The terms and conditions set forth in this booklet may not be modified by any oral statement. It is the intention of the Plan Sponsor to continue the Plan. However, the Plan Sponsor, in its sole discretion, may at any time

---

[3] Though the Plan states on its face that Bowater was the sponsor of the POS-A, Bowater denies that it was in fact the sponsor. *See* Defendants' Opposition to Plaintiffs' Statement of Material Facts (Docket Item No. 141) ¶ 13.

[4] The Plan document and the Summary Plan Description were the same for the POS-A Plan.

modify or amend the provisions, terms and conditions of the Plan or may
at any time terminate the Plan without the consent of any Participant or
any other beneficiary under the Plan.  No vested rights of any nature are
provided by the Plan.

POS-A at 4.

The POS-A summary plan description further provides that "coverage under the
plan will terminate upon the earliest of the following events:" (1) "the last day of the
month you cease to be eligible under the Plan;" (2) "the date the Plan Administrator
receives written notice from you with instructions to terminate your coverage or the date
requested in such notice, if later;" (3) "the date specified by the Plan Administrator if you
failed to pay any required contribution for your coverage under the Plan;" or (4) "the date
the entire Plan is terminated." *Id.* at 39.

### 2.  Bowater Indemnity Plan

Certain Plaintiffs in this action were at one time provided medical benefits under
a Plan titled the "Group Protection of Employees of Bowater Incorporated – Great
Northern Paper, Inc. Division."  Benefits under this plan were provided pursuant to two
separate programs, known as the "Hourly Basic Plan" (hereinafter "Basic Program")
(Attached as Exhibit 11 to Plaintiffs' Statement of Material Facts and Exhibit 94 to
Defendants' Statement of Undisputed Material Facts) and the "Hourly Comprehensive
Plan" (hereinafter "Comprehensive Program") (Attached as Exhibit 12 to Plaintiffs'
Statement of Material Facts and Exhibit 95 to Defendants' Statement of Undisputed
Material Facts).  The Basic Program and the Comprehensive Program are known
collectively as the "Bowater Indemnity Plan" or the "Indemnity Plan."  Plaintiffs'
Statement of Material Facts ¶ 15.  Hourly employees who retired between January 1,
1992, and January 1, 1996, and did not elect to switch coverage to the Bowater POS-A

Plan received medical benefits under one of the two programs comprising the Bowater Indemnity Plan. *Id.* ¶ 17. The Plan documents for both programs comprising the Bowater Indemnity Plan stated that Bowater is the Plan sponsor, Plan administrator, and provider of the medical benefits under the programs. *Id.* ¶ 18.[5]

The Plan documents setting forth benefits provided by the Comprehensive Program and the Basic Program each state that the Plan reserved to the Plan Sponsor the right "to terminate, suspend, withdraw, amend or modify the Plan, covering any active Employee or current or future retiree, in whole or in part at any time." Comprehensive Program at 66; Basic Program at 60. The Indemnity Plan further states that "coverage ceases on the sooner of: (a) the date the Plan ceases; (b) the date the Plan ceases for the class of Employees to which you belong; (c) the date you are no longer a member of the class eligible; (d) the date ending the period for which your last contribution is made, if you are required to pay a part of the cost of the Plan; or (e) the date your active employment with the Employer ceases ...." Comprehensive Program at 25; Basic Program at 21.

### 3. Bowater's Welfare Benefit Plan Amendment Procedure

On July 26, 1995, the Bowater Board of Directors approved an allocation of benefit plan responsibilities whereby the Human Resources and Compensation Committee was assigned the authorization to "[a]pprove plan design, including amendment and termination of plans." Benefit Plans Responsibilities (Attached as Exhibit 15 to Plaintiffs' Statement of Material Facts). On July 23, 1997, the Bowater

---

[5] Bowater once again states that though the Indemnity Plan states on its face that Bowater was the sponsor, Bowater denies that it was in fact the sponsor. *See* Defendants' Opposition to Plaintiffs' Statement of Material Facts ¶ 18.

Board of Directors approved a resolution designating Bowater's Chief Executive Officer and the Bowater Vice President of Human Resources to "act on behalf of the Corporation to establish, adopt, maintain, amend, modify, suspend or terminate … the Welfare Benefit Plans …." Minutes of a Regular Meeting of the Board of Directors of Bowater Incorporated held at New York, New York, on Wednesday July 23, 1997 at 8:00 am, at 8-9 (Attached as Exhibit 17 to Plaintiffs' Statement of Material Facts).

### b.  Bowater's 1999 Sale of Great Northern Paper

In early 1999, Lambert Bedard, on behalf of a company known as Inexcon, initiated an offer to purchase GNP from Bowater.  Defendants' Statement of Undisputed Material Facts ¶ 96.  Inexcon formed Inexcon Maine, Inc. as a holding company to purchase GNP.  *Id.*  The purchase negotiations involved many hurdles, some of which are relevant to the issues presented in this case.  In order to place the instant legal dispute in its proper factual context, the Court recounts the critical elements of the GNP sale process.

### 1.  Bowater's Internal Procedures

At a meeting held in July 1999, the Bowater Board of Directors authorized

> any one of the appropriate officers of the Corporation … to do such other things as may be necessary or appropriate in connection with the [Stock Purchase] Agreement and to consummate the Transaction [with Inexcon] including, without limitation, establishing, adopting, maintaining, amending, modifying, suspending or terminating any and all retirement, compensatory or welfare benefit plans, programs, policies or arrangements maintained by the Corporation or by GNP as is necessary or appropriate to facilitate the Transaction.

Minutes of a Regular Meeting of the Board of Directors of Bowater Incorporated held at New York, New York, on Wednesday, July 28, 1999 at 9:00 am, at 8 (Attached as Exhibit 100 to Defendants' Statement of Material Fact).  Bowater alleges that Wendi

Smith, GNP's benefits manager, amended the summary plan descriptions by substituting GNP in the text of the summary plan descriptions for Bowater Incorporated. Defendants' Statement of Undisputed Material Facts ¶ 215.

### 2. Concessions from GNP Unions

In the midst of the negotiations between Inexcon and Bowater, Inexcon and GNP -- with the assistance of Bowater -- entered into new agreements with each of the four union groups representing the unionized employees from the Millinocket and East Millinocket mills. *Id.* ¶ 135. The union concessions contained in the agreements were apparently a prerequisite to the completion of any deal between Inexcon and Bowater. Each agreement was the result of an offer presented by Inexcon and/or Inexcon and Bowater to each of the four unions. *See* Inexcon and Bowater Offer to PACE[6] and Its Local Unions Representing Millinocket and East Millinocket (dated Aug. 2, 1999) (Attached as Exhibit 67 to Defendants' Statement of Undisputed Material Facts) (hereinafter "Offer to PACE"); Inexcon and Bowater Offer to OPEIU[7] Representing Millinocket and East Millinocket (dated Aug. 5, 1999) (Attached as Exhibit 69 to Defendants' Statement of Undisputed Material Facts) (hereinafter "Offer to OPEIU"); Inexcon Offer to UPGWA[8] Representing Millinocket and East Millinocket (dated Aug. 3, 1999) (Attached as Exhibit 70 to Defendants' Statement of Undisputed Material Facts) (hereinafter "Offer to UPGWA"); Inexcon and Bowater Offer to The Trades Representing Millinocket and East Millinocket (dated Aug. 10, 1999) (Attached as

---

[6] "PACE" is the acronym for Paper Allied-Industrial Chemical & Energy Workers International Union.

[7] "OPEIU" is the acronym for Office and Professional Employees International Union.

[8] "UPGWA" is the acronym for United Plant Guard Workers Association.

Exhibit 71 to Defendants' Statement of Undisputed Material Facts) (hereinafter "Offer to The Trades").  The four offers each had the effect of extending and modifying applicable collective bargaining agreements, subject to the terms contained in the individual offers. The four unions each approved the offers prior to the close of the sale of GNP.

Each union offer made prior to the finalization of the sale of GNP, and subsequently ratified by the respective unions, provided that Bowater's obligations under existing labor agreements terminated immediately following the sale of GNP to Inexcon. *See* Offer to PACE ("Except as specified in this proposal, all Bowater Incorporated obligations under the labor agreement shall cease on the effective date of the new agreement");[9] Offer to OPEIU ("Upon the date of the sale, all Bowater contract obligations except those referred to in the Inexcon offer under 'pensions' shall cease"); Offer to UPGWA ("Upon the date of sale, all Bowater contractual obligations except those referred to in the Inexcon offer under 'pensions' shall cease"); Offer to The Trades ("Except as specified in this proposal, all Bowater Incorporated obligations under the labor agreement shall cease on the effective date of the new agreement").[10]  Each offer also provided that "[a]ctive employees on the date of sale shall have until October 1, 1999 to elect retirement and reserve their company-paid retiree health care."

### 3.  Memorandum Dated August 10, 1999

On August 10, 1999, Wendi Smith drafted and sent an Interoffice Memo to the Hourly Employees, which stated as follows:

---

[9] The effective date contained in the Offer to PACE was described as "the Monday following the close of the sale of Great Northern Paper Company stock to Inexcon" unless another date was specified.

[10]  The effective date contained in the Offer to the Trades was described as "the Monday following the close of the sale of Great Northern Paper Company stock to Inexcon" unless another date was specified.

> We have agreed to include those employees who will reach age 55 between the date of closing and September 30, 1999 and have at least 15 years of service, with those employees who are eligible to retire on the date of closing, in the offer to retire with the $28 per month per year of service benefit level and the PBGC interest rate of 4.5% for lump sum calculations.
>
> They will also be included with current Bowater retirees, and those who are eligible to retire on the date of closing, to preserve their lifetime company-paid retiree health care.

Memorandum from Wendi J. Smith, Benefits Manager, Great Northern Paper, to All Hourly Employees 1 (Aug. 10, 1999) (Attached as Exhibit 83 to Defendants' Statement of Undisputed Material Facts).

### 4. Bedard Side Letter

Prior to the close of the GNP sale, a letter signed by Inexcon's Lambert Bedard was apparently distributed to certain unions.  This letter, undated and absent any letterhead or addressee, recites the same language as the August 10, 1999, memorandum from Wendi Smith; to wit:

> We have agreed to include those employees who will reach age 55 between the date of closing and September 30, 1999 and have at least 15 years of service, with those employees who are eligible to retire on the date of closing, in the offer to retire with the $28 per month per year of service benefit level and the PBGC interest rater of 4.5% for lump sum calculations.
>
> They will also be included with current Bowater retirees, and those who are eligible on the date of closing, to preserve their lifetime company-paid retiree health care.

Unaddressed Letter from Lambert Bedard (undated) (Attached as Exhibit 73 to Defendants' Statement of Undisputed Material Facts).  The parties dispute whether this letter was incorporated into the 1999 CBAs reached with the unions.[11]

---

[11] Though the letter was apparently only provided to The Trades, Plaintiffs assert that the other three unions each had a "me too" agreement, whereby any benefit or entitlement offered to one union

### 5.  Closing of the Sale

Inexcon's purchase of GNP was structured as a purchase of all GNP stock and was memorialized in a 1999 Stock Purchase Agreement (hereinafter "SPA"). Defendants' Statement of Undisputed Material Facts ¶ 98).  The 1999 stock purchase agreement was filed with the Securities and Exchange Commission and reflects the terms of the sale of GNP from Bowater to Inexcon.  Plaintiffs' Statement of Material Facts ¶ 29.  During the period of Inexcon's ownership of GNP, Plaintiff retirees continued to receive health and welfare benefits.  Problems arose, however, when GNP began experiencing financial difficulties and ceased performing under its benefit obligations. GNP subsequently filed for bankruptcy in the United States Bankruptcy Court for the District of Maine on January 9, 2003.  *See In re* Great Northern Paper, Inc., No. 03-10048-LHK (Bankr. D. Me.).

### 6.  Bowater's Benefit Plan Changes Subsequent to the Sale of GNP

#### A.  2003 Benefit Plan Consolidation

Effective January 1, 2003, Bowater established the Bowater Incorporated Benefit Plan (hereinafter "BI Benefit Plan") (Attached as Exhibit 27 to Plaintiffs' Statement of Material Facts and Exhibit 122 to Defendants' Statement of Undisputed Material Facts). The terms of this Plan indicated that it was a "continuation, amendment and restatement of plans previously maintained by the Company, as set forth in the relevant summary plan descriptions and the Company's welfare benefit plans."  Bowater Incorporated Benefit Plan § 1.01.  As will be explained in more detail below, Bowater contends that this Plan had the effect of consolidating all Bowater sponsored benefit plans -- including

---

would be available to the other unions.  *See, e.g.*, Exhibits 129 and 131 to Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts.

the POS-A Plan and the Indemnity Plan -- under the umbrella of one Plan.[12]  Pursuant to

the terms of this Plan, GNP retirees are not eligible participants.

### B.  2004 Termination of Benefits for Former GNP Employees

On April 19, 2004, following the initiation of this lawsuit and in an apparent

exercise of caution, Bowater amended the Bowater Incorporated Benefit Plan to

expressly preclude any GNP retirees from seeking welfare benefits from Bowater.

Specifically, Bowater's "Supplement A to Bowater Incorporated Benefit Plan" states the

following:

> Notwithstanding any provision to the contrary in the Plan, any separate
> Benefit Program under the Plan, any predecessor welfare benefit plan, or
> any other welfare benefit plan, program or arrangement with respect to
> which the Company may have any responsibility or liability, for the
> avoidance of doubt, no individual who is an employee or former employee
> of Great Northern Paper, Inc. ("GNP"), and no individual who heretofore
> retired or hereafter retires from the employ of GNP shall be eligible to
> participate in the Plan or any separate Benefit Program under the Plan, nor
> shall any such individual (or any Dependant of any such individual) be
> entitled to any benefit under the Plan, any separate Benefit Program, any
> predecessor or successor thereto, or any other welfare benefit plan,
> program, or arrangement with respect to which the Company may have
> any liability or responsibility, such Plan, Benefit Program, predecessor and
> other programs and arrangements, as applied to GNP and such individuals
> and their Dependents, being terminated as of the date of the sale of GNP
> to Inexcon Maine, Inc., which termination is reaffirmed by this
> Supplement.

Exhibit 127 to Defendants' Statement of Undisputed Material Facts.  Plaintiffs do

not assert that they are entitled to benefits under their Count I ERISA claim

beyond April 19, 2004, and thus have not challenged the procedural effectiveness

of this amendment.

---

[12] Bowater makes this argument in the event that the Court rules that the SPA did not
automatically terminate its liability to GNP retirees.

### III.  ERISA Standard of Review

Bowater's Director of Compensation and Benefits, Aaron Whitlock, and its Pension Administration Committee -- charged with reviewing appeals of Mr. Whitlock's decisions -- relied on four principal grounds for denying Plaintiffs' claims for benefits.[13] First, Bowater alleged that GNP, and not Bowater, provided the medical benefit plan to its employees.  Second, Bowater stated that any obligation it had to GNP retirees under any Plan terminated upon the sale of GNP to Inexcon.  Third, even if a Plaintiff was covered under a Bowater Plan, Bowater asserted that the January 1, 2003, Plan consolidation terminated all other Bowater Plans.  Fourth, Bowater claimed that the April 19, 2004, Plan amendment precluded any former GNP employee from entitlement to benefits under any Bowater Plan.

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.  Bearing in mind the *Firestone* holding, "the threshold question, then, is whether the provisions of the employee benefit plan under which remediation is sought reflect a clear grant of discretionary authority to determine eligibility for benefits." *Leahy v. Raytheon Co.*, 315 F.3d 11, 15 (1st Cir. 2002).  If the Plan does provide the administrator with discretion to interpret the Plan, the Court applies the more deferential "arbitrary and capricious" standard.  *See Wright v. R. R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005).  Under this standard, the Court can only

---

[13] The claims for benefits at issue were filed with Bowater after GNP ceased providing benefits in 2002.

set aside the decision of the Board if that decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97 (1st Cir. 2002); *Giroux v. Fortis Benefits Ins. Co.*, 353 F. Supp. 2d 45, 52 (D. Me. 2005).

All welfare benefit plans at issue in this case give the administrator or fiduciary discretionary authority to determine eligibility for benefits. *See* POS-A at 42 ("The Plan Administrator also has full discretionary authority to control and manage the operation and administration of the Plan. … Any determination by the Plan Administrator will be binding and final, in the absence of clear and convincing evidence that the Plan Administrator acted arbitrarily and capriciously."); Basic Program at 58 ("The Claims Fiduciary shall have the sole and exclusive discretion and power to grant and/or deny any and all claims for benefits and construe any and all issues relating to eligibility for benefits. All findings, decisions, and/or determinations of any type made by the Claims Fiduciary shall not be disturbed unless the Claims Fiduciary has acted in an arbitrary and/or capricious manner."); Comprehensive Program at 64 (same); Bowater Incorporated Benefit Plan at 40 ("The Administrator has discretionary authority to grant or deny benefits under this Plan. Benefits under this Plan shall be paid only if the Administrator decides, in its sole discretion, that the Covered Person is entitled to them.").

Plaintiffs allege that de novo review is appropriate because the basis for Bowater's benefit denials were either legal conclusions or interpretations of documents other than the Plans under which Plaintiffs base their claims. The Court notes that the deferential standard of review of plan interpretation "is appropriate only when the trust

instrument allows the trustee to interpret the instrument and when the trustee has in fact interpreted the instrument." *Moench v. Robertson*, 62 F.3d 553, 567 (3d Cir. 1995) (internal quotation omitted); *see also Hogan v. Raytheon*, 302 F.3d 854, 856 (8th Cir. 2002) (de novo review appropriate "because the Plan administrator in this case did not interpret the Plan's terms, but rather interpreted the meaning of a separate document …."); *Matassarin v. Lynch*, 174 F.3d 549, 563 (5th Cir. 1999) ("A court reviews de novo a plan administrator's legal conclusions regarding the meaning of a contract or statute."); *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 114 (3d Cir. 1994) (stating that the district court "did not err in holding that it should review de novo the plan administrator's construction of the [divorce agreement], which involved issues of contract interpretation under the Agreement and not the Plan").

Bowater acknowledges, quite correctly, that the plan administrator is due no deference in determining whether the 1999 sale of GNP resulted in a plan termination as a matter of law or whether Bowater was a plan sponsor under the POS-A and Indemnity Plans. *See* Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 20 n.30. The standard of review question thus becomes whether the administrator's conclusion that the 2003 Plan superseded the POS-A and Indemnity Plans is due any deference. Plaintiffs' argue that

> Bowater's invocation of a *separate* plan -- the 2003 Plan -- as a defense to claims under the two plans at issue here, does not entitle it to deference with respect to the interpretation of the 2003 plan document. … [B]ecause the threshold -- indeed, the only -- issue here involving the 2003 Plan is whether that plan even *addresses* the POS A and Indemnity Plans, it makes no sense to permit Bowater to bootstrap itself into deference by allowing it to invoke the 2003 Plan's discretion provision as the starting point of analysis, when the very issue in dispute between the parties is whether the 2003 Plan even applies to participants in the Bowater POS A and Indemnity Plans.

Plaintiffs' Motion for Partial Summary Judgment at 23 (emphasis in original).  Bowater

maintains, however, that "Plaintiffs' proposed rule would handcuff administrators of

amended benefit plans: a participant could bring a claim under the pre-amendment plan,

and the administrator's determination that the plan terms were superseded by the

amendment would be given no deference -- even though the administrator had deference

to interpret the terms of both the pre- and post-amendment plans."  Defendants'

Opposition to Plaintiffs' Motion for Partial Summary Judgment at 21-22.  Because the

2003 BI Benefit Plan reserved discretion to the plan administrator, and because the

administrator interpreted the Plan in reaching his conclusion, the Court concludes that the

arbitrary and capricious standard is appropriate.  *Accord Recupero v. New Eng. Tel. &*

*Tel. Co.*, 118 F.3d 820, 828 (1st Cir. 1997) ("district courts do not have expansive

plenary jurisdiction to decide the merits of a claim anew if 'the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan.'" (quoting *Bellino v. Schlumberger Tech., Inc.*, 944 F.2d

26, 29 (1st Cir. 1991)).[14]

The arbitrary and capricious standard does not, however, require or allow the

Court to rubber stamp the administrator's determination.  "[T]he administrator's decision

must be upheld if it is reasoned and supported by substantial evidence.  Evidence is

substantial if it is reasonably sufficient to support a conclusion, and the existence of

contrary evidence does not, in itself, make the administrator's decision arbitrary."

*Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004) (internal citation

---

[14] Plaintiffs' argument that de novo review is appropriate simply because the 2003 BI Benefit Plan is not the Plan under which Plaintiffs base their claims is unavailing.  All Plans at issue in this case reserve discretion to the administrator and the administrator logically based his decision on an interpretation of what he considered to be the sole active benefit plan.

omitted); *see also Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 29 (1st Cir. 2001) (same).

## IV.  Discussion

### a.  Plaintiffs' Count I ERISA Claims

A civil action may be brought by a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C. § 1132(a)(1)(B).  The crux of the dispute contained within parties' cross motions for summary judgment on Plaintiffs' Count I ERISA claim concerns whether Bowater was the sponsor of the benefit plans at issue and if so, when and if Bowater terminated its liability under the welfare benefit plans to exclude the class Plaintiffs from coverage. Plaintiffs allege that the terms of the Plans unequivocally designate Bowater as the Plan Sponsor.  Furthermore, Plaintiffs contend that the sale of GNP to Inexcon did not terminate Bowater's liability to GNP retirees for welfare benefits and that the January 1, 2003, BI Benefit Plan had no effect on any of the Plans upon which Plaintiffs base their claims.  In contrast, Bowater maintains that GNP, and not Bowater, sponsored the Plans at issue and any designation of Bowater as sponsor was an unauthorized mistake. Additionally, Bowater contends that the terms of the Stock Purchase Agreement and the fact that Plaintiffs received benefits directly from GNP following the sale requires a conclusion that GNP assumed benefit responsibilities and Plaintiffs are not entitled to look to Bowater as the source of their retiree welfare benefits once GNP -- under Inexcon's ownership -- ceased providing the benefits.  In the alternative, Bowater argues that the January 1, 2003, BI Benefit Plan eliminated the Plans upon which Plaintiffs base

their claims for benefits, thereby terminating any rights under such Plans.  If these arguments fail, Bowater lastly posits that the April 2004 amendment to the consolidated Plan terminates the benefit rights, if any, that former GNP employees possessed. Resolution of this dispute as a matter of law requires an analysis of the procedures under ERISA for properly terminating benefit plan obligations.  The Court begins with Bowater's argument that it did not sponsor any of the welfare benefit plans at issue.

### 1.  Bowater as Sponsor

The POS-A Plan undisputedly identifies Bowater as the "Plan Sponsor."  *See* POS-A at 4 ("Bowater, Inc. is the Plan Sponsor and Plan Administrator of the Plan"), 42 (listing Bowater, Inc. as Plan Sponsor and Plan Administrator and providing Bowater's address under heading "Plan Information").  The two components of the Indemnity Plan likewise identify Bowater as the Plan Sponsor.  *See* Basic Program at 57 ("Plan Sponsor is: BOWATER INCORPORATED"); Comprehensive Program at 63 (Plan Sponsor is: BOWATER INCORPORATED").  Bowater contends, however, that the designation of Bowater as Plan Sponsor in the POS-A Plan was made by the Plan's drafters and was unauthorized.  *See* Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 4-5.[15]

Seeking to avoid sponsor designation, Bowater presents a series of arguments, none of which is persuasive.  First, Bowater argues that the face of the Plan documents contains an employer identification number that does not identify Bowater.  Plaintiffs

---

[15] Bowater makes, but does not develop, a similar argument with respect to the Indemnity Plan. Without any developed challenges to the sponsor designation for the Indemnity Plan, the Court cannot conclude, on the existing record, that the designation of Bowater as sponsor was erroneous.  Accordingly, the Court finds that the designation of Bowater as Plan Sponsor in the Plan documents is sufficient to establish that Bowater did in fact sponsor the Indemnity Plan.

note -- and Bowater does not dispute -- that the employer identification number does not correspond to GNP either.  Without any evidence suggesting that the employer identification number corresponds to Great Northern Paper, Bowater's attempt to create an ambiguity fails.  Moreover, as Plaintiffs point out, the employer identification number in question has in fact been used, in Plans not relevant to this litigation, to identify Bowater.  *See, e.g.*, Exhibit 35 to Plaintiffs' Response to Bowater's Additional Facts in Support of Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment; Exhibit 99 to Defendants' Statement of Undisputed Material Facts.

Second, Bowater contends that principles of agency law shield Bowater from any responsibility as Plan Sponsor because the reference to Bowater was unauthorized.  This argument is also unavailing.  Even if the Plan Sponsor designation was an unauthorized error -- and the Court has doubts as to whether this was in fact the case -- Bowater's conduct and its failure to repudiate the designation of Plan Sponsor lead to the conclusion that Bowater affirmed and ratified the terms of the Plans.  *See* RESTATEMENT (SECOND) AGENCY § 94 ("An affirmance of an unauthorized transaction can be inferred from failure to repudiate it."); *see also Inn Foods v. Equitable Co-Operative Bank*, 45 F.3d 594, 598 (1st Cir. 1995) ("When a principal fails to disavow promptly an act of his agent, such a failure both thwarts a damaged third party's ability to mitigate the effects of an unauthorized act and perpetuates an inference of authority reposed in the would-be agent.").  Bowater had knowledge of the documents' terms for at least three years, and it signed in its own name a Plan renewal contract with Healthsource Maine, which stated, "[e]mployer has adopted the program of employee welfare benefits."  Administrative Services Agreement at 1 (Attached as Exhibit 84 to Plaintiffs' Response to Defendants'

Statement of Undisputed Material Facts).  Simply because Bowater's litigation interests are advanced by now challenging the validity of the Plan Sponsor designation does not permit Bowater to escape the undisputable fact that Bowater is designated in the Plan documents as the sponsor and Bowater never took any action during a three year time period -- when it was clearly on notice of the Plan terms -- to disavow the designation.  In such a circumstance, there is no occasion to consider contemporaneous documents to resolve a so-called ambiguity.  *See Bellino v. Schlumberger Tech., Inc.*, 944 F.2d 26, 30 (1st Cir. 1991) ("where a disputed term is unambiguous, we presume its natural meaning to be conclusive evidence of such intent.").

Bowater next maintains that under ERISA, in a single-employer plan, the "plan sponsor" is by definition the employer.  *See* Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 5 n.5.  Consequently, Bowater argues, GNP was the true plan sponsor and there is a conflict on the face of the SPD.  This argument is meritless.  ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."  29 U.S.C. § 1002(5).  Under this broad definition, corporate parents may establish benefit plans for the employees of its wholly owned subsidiary.  *See Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993); *see also Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992); *Reichelt v. Emhart Corp.*, 921 F.2d 425, 427-28 (2d Cir. 1990).

In a final effort to avoid sponsor designation, Bowater argues that any error in the SPD is harmless, and Plaintiffs knew or should have known that GNP was in fact the plan sponsor, and Plaintiffs experienced no detrimental reliance.  This argument also fails.  The cases cited by Bowater requiring reliance dealt with discrepancies between

comprehensive plan documents and summary plan documents.  *See, e.g., Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171 (2d Cir. 2005) (requiring a showing of prejudice where the SPD is deficient); *Govoni v. Bricklayers, Masons & Plasterers Int'l Union*, 732 F.2d 250, 252 (1st Cir. 1984).  The present dispute involves a representation in the plan terms, not any discrepancy between a SPD and Plan terms.  As articulated by the Court of Appeals for the Second Circuit, "we are unaware of caselaw to the effect that a plaintiff must show reliance or prejudice to enforce terms of a plan.  Such a limitation on the reliance or prejudice requirement is consistent with the principle that an action under ERISA to enforce plan terms sounds in contract, and a plaintiff generally need not show equitable factors such as reliance or prejudice to enforce contractual terms."  *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1213 (2d Cir. 2002).  Accordingly, the Court holds that Plaintiffs do not need to demonstrate reliance or prejudice in order to enforce the terms of the Plans at issue.

With Bowater established as Plan Sponsor, the Court next turns to Bowater's contention that the sale of GNP to Inexcon terminated any liabilities it possessed under the relevant Plans.

## 2.  Amendments Under ERISA

In construing section 402 of ERISA, the United States Supreme Court has stated that "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits.  Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

Though employers are afforded wide latitude with respect to management of welfare benefit plans, ERISA provides strict procedures and obligations for amending or terminating such plans.  Section 402(b)(3) of ERISA provides that "[e]very employee benefit plan shall … provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan."  29 U.S.C. § 1102(b)(3).  The text of section 402(b)(3) thus contains two prongs: a "procedure for amending [the] plan" and "[a procedure] for identifying the persons who have authority to amend the plan." *Curtiss-Wright*, 514 U.S. at 78.  "Section 402(b)(3)'s primary purpose is obviously functional: to ensure that every plan has a workable amendment procedure." *Id.* at 82; *see also id.* at 83 (the purpose of this provision is to ensure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.") (citing H.R. Rep. No. 93-1280, at 297 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 5077-78).  "An employer satisfies its obligations under ERISA § 402(b)(3) … if it reserves the right to amend the plan and identifies who has authority to do so."  *Haran v. Dow Jones & Co.*, 216 F.3d 1072 (2d Cir. 2000).  "[A]ny modification or amendment to an ERISA plan can be implemented or applied only after the amendment has been appropriately adopted in a formal, complete and written form." *Smith v. Nat'l Credit Union Admin. Bd.*, 36 F.3d 1077, 1081 (11th Cir. 1994); *see also Bellino v. Schlumberger Tech., Inc.*, 944 F.2d 26, 33 (1st Cir. 1991) (stating that all ERISA plan amendments must be in writing); *Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988) ("An ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries."); *Dall v. Chinet Co.*, 33 F. Supp. 2d 26, 35 (D. Me. 1998).  Accordingly, amendments to an

24

ERISA welfare benefit plan must be adopted in writing and pursuant to the terms set forth in the benefit plan.

It is undisputed that Bowater had in place a procedure for amending the Plans at issue and identified the individuals with authority to take such action -- Bowater's Chief Executive Officer and the Bowater Vice President of Human Resources. What is in dispute is whether the Stock Purchase Agreement followed the amendment procedure or served to terminate Bowater's obligations as a matter of law, and if not, whether the 2003 establishment of the Bowater Incorporated Benefit Plan terminated all rights under the POS-A Plan and the Indemnity Plan.

### 3.  Stock Purchase Agreement

Bowater first argues that the Stock Purchase Agreement "constitutes corporate action sufficient to satisfy the termination standard enunciated in *Curtiss-Wright*" and "[g]iven that the Stock Purchase Agreement ended any responsibility Bowater had for the GNP welfare plans, those plans were terminated as a matter of law." Defendants' Motion for Summary Judgment at 21-22.[16] Relying on *Chiles v. Ceridian Corp.*, 95 F.3d 1505 (10th Cir. 1996),[17] Bowater presents a theory of automatic termination of benefit plans upon sale of a corporate division or subsidiary.[18] In particular, Defendants rely on the following passage:

---

[16] Specifically, Bowater focuses on two sections of the SPA -- sections 4.12 and 4.20. As Plaintiffs note, however, both of these sections are disclosure sections and do not purpose to provide for any changes or termination of the benefit plans at issue.

[17] Bowater also cites *Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir. 1992), and *Sejman v. Warner-Lambert Co.*, 889 F.2d 1346 (4th Cir. 1989), for support of its automatic termination rule.

[18] As noted *supra*, whether the Stock Purchase Agreement had the effect of terminating Plaintiffs' rights under welfare benefits plans is a question of law, and thus the administrator's determination that the SPA relieved Bowater of all obligations and liability is reviewed de novo.

>Essential features of an ERISA plan include a procedure for establishing and carrying out a funding policy for the plan and procedures for the operation and administration of the plan.  29 U.S.C. § 1102(b).  After the sale of Imprimis none of these provisions remained of the Control Data LTD Plan as far as plaintiffs were concerned; the responsibilities for funding and administering plaintiffs' disability benefits shifted to the Seagate LTD Plan.  Given the facts of this case, the Control Data LTD Plan terminated with respect to Imprimis division employees when Control Data was released from its obligation to fund the plan with respect to those employees and the employees could look to the Seagate LTD Plan for benefits.

*Id.* at 1516.  Plaintiffs dispute the existence of an "automatic termination" rule, directing the Court to *Algie v. RCA Global Comm.*, *Inc.*, 60 F.3d 956 (2d Cir. 1995), and its holding that "we reject appellants' argument that the sale of a corporation … automatically results in the termination of benefit plans sponsored by that corporation." *Id.* at 961.

Without any guidance on the existence of an automatic termination rule from the Court of Appeals for the First Circuit, this Court must evaluate the apparent conflicting positions espoused in *Chiles* and *Algie*.  Bearing in mind the holding of the Supreme Court in *Curtiss-Wright* and the formalistic nature of ERISA, the Court is of the opinion that an automatic termination rule would circumvent and disturb the very purpose of ERISA.  As this Court has previously noted, the purpose of ERISA is "to protect the interests of employees in employee benefit plans."  *Dall*, 33 F. Supp. 2d at 43.  Automatic termination, achieved without following specified plan amendment procedures, simply cannot satisfy the requirements of ERISA.  *Accord Biggers v. Wittek Indus.*, 4 F.3d 291, 295-96 (4th Cir. 1993) ("the courts have consistently held that plan modifications adverse to the participants, including termination of benefits for participants, be in writing and issued under circumstances manifesting a clear intent to

alter the plan."); *Dall*, 33 F. Supp. 2d at 42 ("amendments to an ERISA welfare plan must be adopted in writing and in the manner required under the benefit plan.").[19]

The SPA quite clearly did not purport by its terms to be a plan termination.[20] Further, the Court declines to adopt an automatic termination rule.  Despite the fact that Bowater may have *intended* to terminate its obligations under the POS-A and Indemnity Plans, it never took any action at the time of the sale conforming to the termination requirements of the Plans to effectively carry out that intent.[21]  A Court cannot simply adopt Bowater's intent without any effective action corresponding to Plan requirements. *See Gamble v. Group Hospitalization & Medical Servs.*, 38 F.3d 126, 131 (4th Cir. 1994) ("When persons with the power to amend a plan come to recognize that it needs to be amended to reflect a change of circumstances, that recognition alone does not effect an amendment of the plan, even though that may have been their firm intent.  Until the plan is in fact amended, intent to do so is nothing more than that, and the plan's terms remain

---

[19] Wendi Smith's alleged action of substituting GNP for Bowater in the Plan documents is not a proper amendment for two reasons: first, she did not have authority to effectuate Plan amendments; second, merely deleting "Bowater, Inc." and inserting "Great Northern Paper, Inc." is not an amendment adopted in accordance with the Plan terms.

[20] Though it is undisputed that following Inexcon's acquisition of GNP, retiree benefits were paid by GNP, that fact alone is not sufficient to absolve Bowater of liability.  The arrangement between Bowater and Inexcon to fund retiree welfare benefits -- for employees who retired during Bowater's ownership of GNP or during a short window thereafter -- is not sufficient to constitute a formal plan amendment expressly relieving Bowater of liability.  Bowater had the opportunity to formally relieve itself of any liability toward the GNP retirees at the time of the sale by executing a proper plan amendment.  Bowater in fact took such action -- as it rightfully could -- on April 19, 2004, but took no such effective action at the time of the sale.

[21] Plaintiffs correctly note that "Bowater did not execute any document contemporaneous with the 1999 GNP sale that purported to terminated or amend the Bowater POS A Plan or the Indemnity Plan, let alone did Bowater execute any document signed by either of the two Bowater officers who had the authority to terminate or amend Bowater-sponsored welfare benefit plans."  Plaintiffs' Motion for Partial Summary Judgment at 5.

as written.").  Accordingly, the Court concludes that the SPA did not, as a matter of law, serve to terminate the welfare benefit plans upon which Plaintiffs base their claims.[22]

### 4.  2003 Adoption of the Bowater Incorporated Benefit Plan

Bowater next contends that its adoption of the Bowater Incorporated Benefit Plan terminated all other Bowater benefit plans, including those upon which Plaintiffs base their claims for benefits.  Specifically, Bowater posits that the "plans relied upon by Plaintiffs are not among those consolidated into the BI Benefit Plan and are therefore terminated, for the BI Benefit Plan expressly 'supersedes and replaces any program document defining the terms of or describing a Benefit Program that is not incorporated and made part of the Plan.'"  Defendants' Motion for Summary Judgment at 22-23 (citing BI Benefit Plan § 1.03).  Furthermore, in explaining its rationale to GNP retirees for denying benefit claims, Bowater stated the following:

> To the extent that you seek benefits under any benefit plan other than the Bowater Incorporated Benefit Plan (the "Plan"), Bowater denies having any obligations under such plan.  To the extent that you seek benefits under the Bowater Incorporated Benefit Plan, I have determined that you are not eligible under the Plan. … [E]ven if you had been covered under the Plan, that Plan was amended effective January 1, 2003, and your coverage under the terms of that Plan was terminated on that date.  The eligibility provisions of the Plan (§§ 3.01, 2.19, and 2.20) provide that only employees of an Affiliate listed on Appendix B are eligible to participate in the Plan, and GNP is not one of the companies listed on

---

[22] During the course of this litigation, Bowater has raised the defense that salaried retirees forfeited any rights they had under the plans because they failed to pay premiums to Bowater as required under the Plan terms. *See, e.g.*, Declaration of Aaron Whitlock (Docket Item No. 124) ¶ 9 ("[c]laimants who had formerly been salaried employees of GNP were required under the terms of the applicable health care plan to pay quarterly premiums.  No salaried retirees of GNP have paid premiums to Bowater at least since the sale of GNP to Inexcon.  For those individuals, a separate ground for denying their claim for benefits is their failure to pay the required premiums.").  This defense cannot stand in light of the fact that Bowater's purported release from benefit plan liability was not memorialized in accordance with the terms of the respective Plans.  Bowater's *informal* arrangement with Inexcon thus has no effect on the retirees.  The retirees paid their premiums and simply because, at Bowater's direction, they made these payments to GNP and/or Inexcon for the convenience of Bowater, does not prevent them from recovering benefits from Bowater, whose liability was not properly terminated until promulgation of the BI Benefit Plan on January 1, 2003.

Appendix B.[23]  The termination provisions of the Plan (§3.02) provide that an individual shall cease to be covered under the Plan at the end of the day as of which the Benefits Program is terminated or amended so as to no longer apply to the Participant.  Thus, any coverage you had under the Plan was terminated effective January 1, 2003.

*See, e.g.*, Letter from Aaron B. Whitlock, Director of Compensation and Benefits, Bowater, Inc., to Joseph Gagliardi (Apr. 13, 2004) (Attached as Exhibit 31 to Plaintiffs' Statement of Material Facts).[24]  According to Bowater, the crux of the amendment, as it relates to the present dispute, is that the POS-A and Indemnity Plans were consolidated into the BI Benefit Plan and Plaintiffs, according to the terms of the BI Benefit Plan, were not eligible to participate.  Plaintiffs, as expected, dispute Bowater's construction of the BI Benefit Plan and argue that the BI Benefit Plan has no impact upon the continuation of the POS-A and Indemnity Plans.  The gist of Plaintiffs' argument centers on the textual capitalization scheme employed by the Definition section of the BI Benefit Plan and the application of section 1.03 of the BI Benefit Plan to the POS-A and Indemnity Plans.

Resolution of this issue begins with section 1.03 of the BI Benefit Plan.  Section 1.03 states as follows:

---

[23] The Affiliates listed on Appendix B are the following: Bowater Newsprint South, Inc.; Bowater America, Inc.; Bowater Nuway, Inc.; Bowater Alabama, Inc.; and Lake Superior Forest Products, Inc.

[24] In its denial of Mr. Gagliardi's appeal of Mr. Whitlock's decision, the Bowater Incorporated Pension Administrative Committee employed similar rationale, to wit:

> Under Section 3.01of the BI Plan, eligibility is limited only to full-time Employees.  An Employee is defined under section 2.19 as a person who is compensated by an Employer.  An Employer is defined as an Affiliate listed on Appendix B of the BI Plan.  GNP is not one of the affiliates listed on Appendix B of the BI Plan.  Thus, you are not an Employee eligible for benefits under the BI Plan.  Section 3.02 of the BI Plan provides that an individual shall cease to be covered under a Benefit Program at the end of the day as of which the Benefit Program is terminated or amended so as to no longer apply to the participant.  Thus, any coverage you may have had under the Claimed Benefit Plan was terminated effective January 1, 2003.

Letter from James T. Wright, Member, Bowater Incorporated Pension Administration Committee, to Joseph Gagliardi, Jr. 4 (Sept. 23, 2004) (Attached as Exhibit 33 to Plaintiffs' Statement of Material Facts).

> The separate Benefit Programs that are consolidated into the Plan are listed in Appendix A.  Separate Program Documents which describe the specific benefits provided by each Benefit Program, the individuals covered by each Benefit Program and the other terms and conditions of each Benefit Program, including any contract with an Insurance Company maintained in connection with a Benefit Program, as amended from time to time, shall be incorporated herein by this reference.  The Plan supersedes and replaces any program document defining the terms of or describing a Benefit Program that is not incorporated and made part of the Plan.

BI Benefit Plan § 1.03.  The Definitions section of the BI Benefit Plan indicates that "[w]henever capitalized and used in the Plan, the following words and phrases shall have the respective meanings specified in this Section *unless the context plainly requires a different meaning*."  *Id.*, art. II (emphasis added).  "Benefit Program" is defined to mean "a separate welfare plan program that is sponsored by an Employer and which forms part of the Plan and is incorporated herein by this reference."  *Id.* § 2.04.  "Program Document" is defined to mean "the written summary of the terms of each separate Benefit Program, that may consist of a summary plan description, separate plan document and/or Insurance Company contract or certificate."  *Id.* § 2.44.

The POS-A and Indemnity Plans are not among the "Benefit Programs" listed in Appendix A of the BI Benefit Plan; thus, Plaintiffs contend that the first sentence of section 1.03 has no applicability to their claims.  For similar reasons, Plaintiffs contend that the second and third sentences have no applicability to their claims.  Specifically, Plaintiffs argue the following:

> The second sentence incorporates into the 2003 Plan those particular program documents that describe a listed "Benefit Program" and that, under the Plan definition provision set forth above, *do* have the requisite formality to qualify as capitalized "Program Documents."  The third sentence excludes and supersedes those particular program documents that purport to define or describe a listed "Benefit Program," and that do *not* have the requisite formality to qualify as capitalized "Program

Documents." That is why in sentence [3], but not in sentence [2], the term "program document" is in lower-case letters.

Plaintiffs' Motion for Partial Summary Judgment at 19 (emphasis in original).

Defendants dispute this characterization of section 1.03, arguing that in the context of section 1.03, the exception to the definition section applies and any program document -- including the POS-A and the Indemnity Plans -- not incorporated and made part of the BI Benefit Plan is expressly superseded.

In this instance, the context expressly alters the term "Benefit Program" by adding the phrase "that is not incorporated and made part of the Plan." When the capitalization convention is quoted in its entirety, Plaintiffs['] argument that there "can be no such thing as a 'Benefit Program that is not incorporated and made part of the Plan'" … is plainly false. Indeed, that is precisely what the language was intended to convey.

Thus, when properly read, Section 1.03 provides that Benefit Programs consolidated into the Plan are listed in Appendix A. Program Documents describing those Benefit Programs are incorporated into the Plan. Any other program document is superseded and replaced if it describes a "Benefit Program that is not incorporated and made part of the Plan." Indeed, given that Section 1.03 is titled "Benefit Programs," it follows that that section is intended to define the contours of a Benefit Program (including which ones are incorporated and which superseded), and it is not attempting to parse "formal" program documents from "informal" ones, as Plaintiffs suggest.

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 18.

Plaintiffs' position rests on a strict construction of the textual capitalization scheme set forth in the BI Benefit Plan and ignores the context exception contained in the definition section. The Court has carefully reviewed the Plan and the parties' respective arguments, and cannot conclude, as a matter of law, that Defendants' interpretation of the 2003 Plan -- that it supersedes the POS-A and Indemnity Plans -- is arbitrary and capricious. In the context of section 1.03, the Court finds the administrator's interpretation of "program document" entirely reasonable. There is a logical conclusion

to be drawn that one purpose of the BI Benefit Plan, as set forth in section 1.03, was to abrogate any other plans maintained by Bowater.  Plaintiffs simply have not presented a sufficient basis -- other than their strict interpretation of the textual capitalization system -- indicating that the BI Benefit Plan is not a valid termination of the POS-A and Indemnity Plans.  Without any evidence to that effect, the Court concludes that the administrator's interpretation of the document is not arbitrary and capricious. Consequently, the BI Benefit Plan terminated the POS-A and Indemnity Plans. Bowater's liability under such Plans -- and thus its liability to Plaintiffs -- ceased on the effective date of the BI Benefit Plan -- January 1, 2003.  Accordingly, Plaintiffs are entitled to Summary Judgment only to the extent they seek benefits through January 1, 2003.

### b.  Plaintiffs' LMRA Claims

Plaintiffs' claims under the Labor Management and Relations Act allege that pursuant to various collective bargaining agreements, union-represented retirees "are entitled to lifetime retiree health insurance and other retiree welfare benefits, with no premium payments required of the employee or the employee's eligible dependents." Third Amended Complaint (Docket Item No. 82) ¶¶ 69, 72.  Plaintiffs further allege that Bowater has breached the collective bargaining agreements by failing to provide the promised benefits.  *Id.* ¶¶ 70, 73.

To defeat Defendants' Motion for Summary Judgment on the LMRA claims, Plaintiffs must first establish genuine issues of material fact as to whether the collective bargaining agreements provided for lifetime company-paid health and life insurance

benefits.  After review of the record and the parties' submissions, the Court concludes

that Plaintiffs have not met this first hurdle.

### 1.  Pre-1999 Collective Bargaining Agreements

It is undisputed that the pre-1999 CBAs limit retiree health benefits to "during the

term of this Agreement."[25]  Plaintiffs argue, however, that this durational limitation "can

reasonably be read only to affirm the proposition that during the term of the agreement,

the benefits will be provided as specified, and not to negate the proposition that the

benefits will continue throughout the employees' retirement."  Plaintiffs' Opposition to

Defendants' Motion for Summary Judgment at 2.  Plaintiffs argue that a latent ambiguity

exists as to whether benefits are provided beyond the term of the agreement and thus the

Court should consider extrinsic evidence to shed light on this question.[26]

---

[25] It is also of note, though not directly relevant to disputes concerning CBAs, that the POS-A Plan expressly states that "no vested rights of any nature are provided by the Plan."  POS-A at 4.

[26] The extrinsic evidence that Plaintiffs suggest the Court review includes the following:

a.      A November 4, 1997, memorandum written by Donald McNeil, Bowater's Vice President for GNP Operations;

b.      An August 10, 1999, email transmitted by Wendi Smith to GNP hourly employees;

c.      A document signed by Lambert Bedard that tracks the language of the August 10, 1999 email.

d.      A 1997 document summarizing terms of health benefits for hourly active employees and retirees produced from Bowater's mergers and acquisitions law firm;

e.      Bowater's course of performance in handling its benefit plans;

f.      The manner in which Bowater valued GNP's assets and liabilities prior to the sale of GNP.

Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 4-10.  Though the August 10 e-mail and corresponding memorandum signed by Lambert Bedard were produced during the time the 1999 CBA amendments were negotiated with the respective unions, Plaintiffs indicated that their "claims do not turn on whether either or both of the August 10 memoranda constitute formal amendments to the CBAs; rather, plaintiffs' claims turn only on whether those memoranda … can be considered in construing the meaning of the agreements that were already in place."  *Id.* at 7.  In the face of unambiguous collective

Latent ambiguity is defined as "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." BLACK'S LAW DICTIONARY 88 (8th ed. 2004).[27] Virtually all courts faced with a challenge to durational limitation clauses based on alleged ambiguity have found the terms unambiguous. *See, e.g.*, *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 441 (7th Cir. 1998) (rejecting argument that "the phrase 'for the term of this Agreement' is one of those contractual terms that may seem clear on its face but in reality is ambiguous, rather like the ship *Peerless* or the use of specialized trade jargon."); *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 981 (2d Cir. 1997) (where contract contained clause limiting benefits to "during the term of this Agreement" the court held that "the terms of the CBA unambiguously establish that … [the employer] had no obligation to provide medical insurance to its retirees after the CBAs expired, and therefore, plaintiffs' extrinsic evidence cannot change the result."); *cf. Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 545 (7th Cir. 2000) (distinguishing *Corrao* insofar as the collective bargaining agreement between the employer and the union in *Corrao* limited health and welfare benefits to the "term of this agreement." The latent ambiguity found by the *Rossetto* court was due to the absence of such a durational limitation in the union contract negotiated with the *Rossetto* plaintiffs).[28]  It is apparent to

---

bargaining agreements, however, the Court will not look to extrinsic evidence to construe the plain meaning of such agreements.

[27] The classic example of a latent ambiguity, cited by Black's Law Dictionary, arises in the famous case of *Raffles v. Wichelhaus*, 2 Hurl. C. 906 (1864), in which a contract called for shipping of goods on the ship *Peerless*, but the parties each had in mind a different ship bearing the same name.

[28] Plaintiffs also rely on *United Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987).  The collective bargaining agreement at issue in *Textron* did not involve a durational limitation clause, making the factual predicate for the *Textron* opinion distinguishable from the present case.  The Court also notes

the Court that the durational language is unambiguous and Plaintiffs are attempting to use extrinsic evidence to create a latent ambiguity, rather than using such evidence to clarify an ambiguity.  *Accord Vulcan Arbor Hill Corp. v. Reich*, 81 F.3d 1110, 1117 (D.C. Cir. 1996) (extrinsic evidence cannot be used to alter the meaning of unambiguous terms).

It is a long-standing principle that "unless there is obscurity or latent ambiguity … you cannot go out of the instrument for explanation."  *Cook v. Moffat & Curtis*, 46 U.S. 295, 295 (1847).  Accordingly, the Court construes the CBAs according to their plain terms and without consideration of any extrinsic evidence.  *See Den norske Bank AS v. First Nat'l Bank*, 75 F.3d 49, 52 (1st Cir. 1996).  Because the CBAs expressly indicate that benefits provided are limited to the term of the agreement, Plaintiffs cannot adduce genuine issues of material fact concerning the duration of health benefits.  Accordingly, Defendants' are entitled to summary judgment on Count II.[29]

### 2.   The 1999 Collective Bargaining Agreements

Plaintiffs' claim to vested retiree benefits for the Subclass B retirees -- those who retired within a short window following the sale of GNP -- depends on language of the four 1999 CBAs.  As Plaintiffs concede, the unions had the authority to release Bowater from any contractual obligation for retiree welfare benefits in these 1999 negotiations.  *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 23.  As the 1999 amendments, ratified by each union, make clear, Bowater's obligations terminated.

---

that *Textron* was decided on review of a preliminary injunction, and the Court of Appeals did not reach a conclusion regarding the alleged ambiguity of the collective bargaining agreement.

[29] Because the Court concludes that the collective bargaining agreements are unambiguous and do not provide for health and welfare benefits beyond the term of the agreement, the Court has no occasion to consider the issue -- heavily disputed by the parties -- of whether the pre-1999 CBAs are enforceable against Bowater under the "single employer/appropriate unit" doctrine.  This issue is moot in light of the Court's finding that the CBAs are unambiguous.  Likewise, the Court need not resolve the issue of whether the Summary Plan Descriptions -- and their included reservation of rights clauses permitting Bowater to amend or terminate the Plans at any time -- are incorporated into the CBAs.

*See* Offer to PACE at Coffin 2254 ("Except as specified in this proposal, all Bowater Incorporated obligation under the labor agreement shall cease on the effective date of the new agreement"); Offer to OPEIU at 8 ("Upon the date of the sale, all Bowater contract obligations except those referred to in the Inexcon offer under 'pensions' shall cease"); Offer to UPGWA at L 549 ("Upon the date of sale, all Bowater contractual obligations except those referred to in the Inexcon offer under 'pensions' shall cease"); Offer to The Trades as L69 ("Except as specified in this proposal, all Bowater Incorporated obligations under the labor agreement shall cease on the effective date of the new agreement").

      Plaintiffs attempt to establish Bowater liability for welfare benefits through reliance on a subsequent clause, contained in each union offer, stating, "Bowater will retain the liability for retirement benefits earned and accrued through the day of the sale." This phrase, however, is included in the section of the agreements concerning pensions and is clearly written in the context of a pension proposal. Under ERISA, pension benefits, unlike welfare benefits, are vested and may not be terminated by an employer. *See, e.g.*, *Bauer v. RBX Indus.*, 368 F.3d 569, 584 (6th Cir. 2004) ("Welfare benefit plans are not subject to mandatory vesting requirements under ERISA, unlike pension plans."). Plaintiffs strained interpretation of the 1999 agreements does not generate a genuine issue of material fact.[30]

---

[30] Plaintiffs' interpretation of the 1999 agreements is also undercut by the fact that the terms of all four 1999 agreements indicate that the terms of the 1995 CBAs remain "in full force and effect" unless specifically modified by the 1999 agreements. The 1999 agreements do not alter the language limiting retiree benefits to "the term of the agreement," thereby leaving that language as controlling.

### 3. **Bedard Letter**

Plaintiffs' argument that the Bedard side-letter alters the terms of the 1995 agreements and specifically provides for vested benefits is equally unpersuasive. Even if the Bedard side letter is considered an attachment to the 1999 agreements and incorporated therein,[31] the letter is insufficient to grant vested health care benefits. The overwhelming majority of courts require specific language in plan documents indicating an intention for welfare benefits to vest. *See Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir. 1993) (vesting "commitments must be found in the plan documents and must be stated in clear and express language."); *see also Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005) (An intention to vest benefits "must be found in clear and express language in plan documents.") (internal punctuation omitted); *Vallone v. CAN Fin. Corp*, 375 F.3d 623, 632 (7th Cir. 2004) ("a modification that purports to vest welfare benefits must be contained in the plan documents and must be stated in clear and express language."); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir. 1999) (stating that "an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language"); *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 667 (6th Cir. 1998) (stating that "the intent to vest . . . must be found in the plan documents and must be stated in clear and express language"); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1513 (10th Cir. 1996) ("Contractual vesting of a welfare benefit is an extra-ERISA commitment that must be stated in clear and express language.") (internal quotation marks omitted); *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995) ("A contractual agreement for vesting of benefits must be found in the plan documents."); *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.*, 58 F.3d

---

[31] Bowater disputes this position.

896, 902 (3d Cir. 1995) ("The plan participant bears the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested."); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 856 (4th Cir. 1994) ("we hold that the modification clause, standing alone, is more than sufficient to defeat plaintiffs' claim that the company provided vested benefits and thus waived its statutory right to modify or terminate the health benefit plan."); *Howe v. Varity Corp.*, 896 F.2d 1107, 1109 (8th Cir. 1990) ("Plaintiffs have the burden of proving vested welfare benefits. … [T]his burden was not met by the employer's promise to provide welfare benefits "until death of retiree" where the employer had expressly reserved the right to terminate or amend the plan.") (internal citation omitted); *Boucher v. Williams*, 13 F. Supp. 2d 84, 96 n.7 (D. Me. 1998) ("an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language.") (citing *Wise*, 986 F.2d at 937) (internal quotation marks omitted)). Accordingly, the Bedard document simply cannot guarantee vested benefits without corresponding and proper amendments to the Plan and the collective bargaining agreement.  To the extent Plaintiffs claim that the Bedard document simply *reinforces* an existing understanding that health benefits are vested, that interpretation cannot stand in light of the clear and unambiguous terms of the collective bargaining agreements that dictate an opposite outcome.  Accordingly, Defendants are entitled to summary judgment on Count III.

### V. Conclusion

For the reasons set forth above it is **ORDERED** as follows:

> 1.  Plaintiffs' Motion for Partial Summary Judgment be, and it is hereby, **GRANTED** on Count I to the extent it encompasses the period prior to January 1, 2003, and is otherwise **DENIED**;
>
> 2.  Defendants' Motion for Summary Judgment be, and it is hereby, **GRANTED** as to Count I to the extent it encompasses the period on and after January 1, 2003, and is otherwise **DENIED**;
>
> 3.  Defendants' Motion for Summary Judgment be, and it is hereby, **GRANTED** as to Counts II and III in their entirety;
>
> 4.  The Court having not considered the document giving rise to the privilege dispute (labeled with Bates Stamp Number 3614), Plaintiffs' Appeal to the District Court of the Magistrate Judge's June 14, 2005, Decision (Docket Item No. 116) is **MOOT**;
>
> 5.  Plaintiffs shall file within thirty days from the date this Order is entered on the docket a proposed procedure for determining damages on that portion of Count I wherein judgment will be entered in their favor;
>
> 6.  The briefs of both parties being comprehensive, incisive, and otherwise of excellent quality, Defendants' Motion for Oral Argument (Docket Item No. 154) be, and it is hereby, **DENIED** as the Court has no need for oral argument.

/s/ Gene Carter
**GENE CARTER**
United States Senior District Judge

Dated at Portland, Maine this 2nd day of September, 2005.